IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| EDWARD ODQUINA,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU, a municipal corporation; AND HOLLY T. SHIKADA in her official capacity as the Attorney General of the State of Hawai‘i,<br><br>Defendants. | Case No. 22-cv-407-DKW-RT<br><br>**ORDER DENYING PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

In January 2021, Plaintiff Edward Odquina applied to the City and County of Honolulu (the "City") for a personalized license plate with the letter combination "FCKBLM." The first three letters are an implied expletive, and the second three letters refer to the movement and organization known as Black Lives Matter. Dkt. No. 1 ¶ 44. The City mistakenly issued the plate to Odquina in violation of State and City rules. After realizing the error, the City recalled the plate, directed Odquina to surrender it by August 19, 2021, and notified Odquina that his non-compliance could result in citation, penalty and possible seizure or impoundment of his vehicle. Notwithstanding these warnings, Odquina has

refused to surrender the plate and has been unable to renew his vehicle registration as a result.

On September 9, 2022, Odquina filed a Complaint, a Motion for Temporary Restraining Order ("TRO Motion") and a Motion for Preliminary Injunction ("MPI") against the City and State (collectively, "Defendants").  Odquina claims violations of his right to free speech under the First Amendment and seeks declaratory relief, damages, and an order enjoining Defendants from enforcing those rules that inhibit his ability to keep his desired vanity plate.  Complaint, Dkt. No. 1; TRO Motion, Dkt. No. 2; MPI, Dkt. No. 3.

The Court DENIES the MPI because Odquina is not likely to succeed on the merits of his free speech claims for two reasons.  First, license plate alphanumerics, even personalized ones, are government speech not subject to First Amendment review.  Second, even if that were not the case, as Odquina contends, the government's rules concerning nonpublic forum speech on vanity plates are reasonable and viewpoint-neutral.  Odquina, in short, does not have a constitutional right to a license plate containing profanity.

## **LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[1]

## RELEVANT FACTUAL BACKGROUND

### I.   State and City Rules for Vanity Plates

All license plates issued in the State of Hawai'i must follow a certain standardized style.  Pursuant to Hawai'i Revised Statutes ("HRS") § 249-9, *et seq.*, the plates must:

> (1) Bear the word "Hawaii" along the upper portion of the plate and the words "Aloha State" along the lower portion of the plate;
>
> (2) Have a distinct contrast between the color of the plate and the numerals and letters thereon; and
>
> (3) Be of such shape, size, and color, and with such arrangements of letters and numbers as may, subject to sections 249-1 to 249-13, be determined by the directors of finance of each county through majority consent.
>
> [Further, t]he numerals on all such plates shall be not less than three inches in height and the strokes thereof not less than three-eighths inch in width . . . .

HRS § 249-9.

---

[1] The standards for a preliminary injunction and TRO are substantially the same.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001), *overruled on other grounds by Winter*, 555 U.S. at 20.  The purpose of a TRO, as opposed to a preliminary injunction, is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing can be held.  *Granny Goose Foods*, 415 U.S. 423, 439 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006).  Here, since a hearing on this matter is unnecessary and has been vacated, and the MPI is DENIED herein, Odquina's TRO Motion, Dkt. No. 2, is also DENIED AS MOOT.

That said, the State provides several opportunities for owners of motor vehicles to personalize their license plates.  For example, organizations may submit special license plate decal designs to the City for approval.  The decal may not "obstruct the visibility of the number or letters or any other information that is required by law to be on the license plate," such that the license plate continues to be "readily identifiable and distinguishable under actual traffic conditions," and the designs may not "[r]epresent any obscene or degrading image, idea, word, or phrase," among other restrictions.  HRS § 249-9.3(e).  As another example, the State authorizes special plates reflecting certain verifiable distinctions, such as "COMBAT WOUNDED," "VETERAN," "PEARL HARBOR SURVIVOR," "FORMER PRISONER OF WAR," "COMBAT VETERAN," "VIETNAM VETERAN," "KOREA VETERAN," "WORLD WAR II VETERAN," "PERSIAN GULF VETERAN," and "GOLD STAR FAMILY."  HRS § 249-9.2.

Most relevant here, individuals may apply for personalized license plate alphanumerics of their own choosing, known in the common vernacular as vanity plates, provided they comply with the State's regulations and the City's more detailed rules.  The State's guidelines provide, in relevant part:

> [T]he director of finance may provide, upon request, special number plates.  The special number plates shall conform to the requirements provided for the uniform number plates except that the owner may request the choice and arrangement of letters and numbers.  The maximum number of letters and numbers shall be six, and only one hyphen will be allowed in addition to and in lieu of the six letters and

numerals.  No other punctuation marks shall be allowed.  *The director of finance shall not issue special number plates which* have the letter and numeral combination of regular plates, *are* misleading or *publicly objectionable*. . . .  The director of finance shall adopt rules pursuant to chapter 91 to carry out this section.

HRS § 249-9.1 (emphasis added).  The City's more detailed standards are memorialized in the 1990 and 1994 amended Rules and Regulations of the Department of Finance for the City and County of Honolulu (hereinafter "Rules").  *See* Declaration of Thomas Farr ("Farr Decl."), Exhs. A–B, Dkt. Nos. 16-2–3.  The Rules provide, in relevant part:

Pursuant to and by virtue of the authority set forth in Section 249-9.1, Hawaii Revised Statutes, the Director of Finance of the City and County of Honolulu, . . . hereby amends his rules and regulations . . . relating to applications for special number plates, to read as follows:

Rule 6.1 Purpose and Scope:

These rules govern the procedures to be followed for the application and issuance of special number plates. . . .

Rule 6.4 Severability:

If any portion of these rules or the applicability thereof should be held invalid for any reason, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provisions or applications and to this end these rules are declared to be severable. . . .

Rule 6.6 Design of Special Number Plates:

1. Special number plates shall conform to all requirements as provided in Section 249-9.1, HRS. . . .

Rule 6.8 <u>Standards for Denial of Special Number Plates</u>:

1. The following applications shall be denied:

    a. Applications with the letter/numeral combination of regular plates.

    b. Applications with the letter/numeral combinations which have been already assigned . . . .

    c. Applications bearing the following types of words or connotations:

        (1) Words or connotations of a sexual or vulgar nature, or relating to excretory functions or intimate body parts;

        (2) Drug-related words or connotations;

        (3) Words or connotations which are ethnic in origin or character and which are judged by the Director to be offensive and disparaging.

2. For purposes of this rule, the following standards shall apply:

    a. In determining the connotation, inference, or tendency of a given request, the Director shall apply an objective test of what inference may reasonably be detected by one conversant with whatever linguistic, numerical, or phonetic mode of communication that may apply to the request. The Director may not consider the subjective intent or the declared meaning of the applicant. The request shall be considered to be the most objectionable connotation that reasonably may be ascribed to it.

    b. "Words of a vulgar nature" shall be those words, the connotation of which is "vulgar," "usually considered vulgar," "not used in polite conversation," or equivalently designated in Webster's Collegiate Dictionary, current edition.

    c. "Intimate body parts" shall include breasts, genitalia, pubic area, buttocks, thighs, and organs related to sexual and

6

eliminatory functions, regardless of whether the request is couched in common, foreign, vulgar, scientific, or other message form.

d. "Drug-related words or connotations" shall mean messages that may objectively be construed as referring to any drug, narcotic, or intoxicant, including alcohol, that may be abused so as to produce a physical or mental condition that is inconsistent with the lawful, safe operation of a motor vehicle by the person affected. . . .

e. "Words or connotations which are ethnic in origin or character" shall mean messages which may reasonably be the basis of age, sex, race, nationality, or creed.

f. "Offensive or disparaging" shall mean any message which may reasonably be construed as singling out any definable class of persons, classified on the basis of age, sex, race, nationality, or creed in a manner that subjects that class to contempt or ridicule, or espouses superiority of that class.

3. The policies underlying this rule are to:

a. Prevent governmental involvement in any discrimination on the basis of age, sex, race, nationality, creed, or religious preference;

b. Protect the public and children, who by necessity must use the public highways and therefore be exposed to license plate messages, from offensive, obscene, or unduly distractive messages that may tend to impair their safety or privacy;

c. Protect license plates, which are necessary to the lawful regulation and identification of vehicles, from vandalism and defacement that impair their function.

d. Avoid the appearance of governmental approval of conduct inimical to the safe, responsible operation of vehicles.[2]

---

[2]The Rules also outline a procedure for appealing any denial.  Dkt. No. 16-2, Rule 6.12.

Along with these Rules, the City's website also includes a hyperlink entitled, "personalized license plates," which directs web users to the following additional guidance:

> License plates are primarily meant for law enforcement officers to identify vehicles in cases of crime and to safeguard drivers on the road.
>
> A Motor Vehicle Registration Branch review staff will reject requests for personalized license plates with letter and number combinations that are deemed to be potentially offensive to good taste and decency.
>
> All personalized license plate requests get a first-round review. The ones deemed questionable get flagged for additional scrutiny.
>
> A personalized license plate is limited to a combination of six letters and numbers.
>
> A space is counted as one character.  One hyphen is allowed in addition to the six letter and number combination.  No other punctuation marks are allowed.
>
> All license plates issued in the City and County of Honolulu are government property and speak for the Hawaiʻi state government. The City and County of Honolulu has the right to regulate what can be written on a license plate as long as the regulations are reasonable and uniformly applied.
>
> Forbidden phrases include terms of lust, depravity, prejudice, hostility, contempt and profanity in English or any other language.
>
> Motorists who are applying for personalized license plates must follow state government guidelines prohibiting lewd, obscene or hateful language.
>
> Motorists requesting personalized plates have to explain on the application the meaning of the phrase they want.

Dkt. No. 1-3; Complaint ¶ 27.

Pursuant to HRS § 249-9.1 and the City's Rules, all requested vanity plates in Honolulu are approved and issued by the Motor Vehicle Registration Branch of the City's Department of Customer Services ("DCS").  If a DCS employee believes any particular vanity plate application violates the City's Rules, the employee will flag the application, and a DCS supervisor will decide whether the plate should be issued.

## II.    Issue and Recall of Odquina's Vanity Plate

On January 5, 2021, Odquina applied for a vanity plate with the letter combination "FCKBLM."  Complaint ¶ 12.  The application was flagged and sent to DCS supervisor Thomas Farr for review.  *Id.* ¶ 17; Declaration of Thomas Farr ("Farr Decl.") ¶¶ 8–9.  Farr contacted Odquina via telephone and asked him what the letter combination meant.  Complaint ¶ 17; Farr Decl. ¶ 9.  Odquina told Farr the letters were "an acronym for his business," and Farr approved the plate, even though he knew that "FCK [wa]s an abbreviated swear word" and that the applicant's subjective intent was irrelevant.  Complaint ¶ 17; Farr Decl. ¶ 9.

Farr subsequently acknowledged that he made "a mistake" and "should have rejected" the plate because of the implied expletive.  Farr Decl. ¶¶ 7, 9 ("Swear words have always been prohibited on personalized license plates.  That's clear in the administrative rules, and it's always been our policy for as long as I can

remember."); *ibid.* ¶ 15 (explaining that the problem was the first three letters requested by Odquina, not the last three); Dkt. No. 2 at 5 n.2 ("Requests with the initial letters 'FCK' and 'FKN' are automatically rejected.").[3]

After receiving word that his vanity plate was approved, Odquina visited the Hawai'i Kai Satellite City Hall to pick it up.  Before issuing the plate, DCS representative Kelsey Niau again flagged it as violating DCS's policy against expletives.  Declaration of Kelsey Niau ("Niau Decl.") ¶¶ 1, 3-4, 6 ("As soon as I saw the plate, I knew that it violated our policy against allowing profanity on license plates."); Farr Decl. ¶ 13.  Niau told Odquina that the plate was not allowed, after which Odquina became agitated and "insisted, repeatedly, that FCKBLM was an acronym for his business."  Niau Decl. ¶ 5.  But Niau knew that "it didn't matter what he said it stood for, since 'FCK' is an abbreviation for a swear word and that's not allowed."  *Id.*  She thus informed her supervisor that the plate violated the DCS policy on profanity, prompting her supervisor to consult with Farr via telephone.  *Id.* ¶ 6.  Farr directed the supervisor to issue the plate anyway because he was "concerned that Mr. Odquina may become aggressive or out of hand," and he "would rather have the plate issued and then recall it" so that he "could thereafter deal with Mr. Odquina directly rather than have him be

---

[3]Farr claims he believed Odquina that "FCKBLM" referred to Odquina's business and that, "[a]t the time, [he] did not know that 'BLM' stood for 'Black Lives Matter.'"  Farr Decl. ¶ 11.

aggressive to Satellite City Hall staff." *Id.* ¶¶ 6–7;  Farr Decl. ¶ 14.[4]  Complying,

the supervisor instructed Niau to issue the plate, and she did so.  Niau Decl. ¶ 6.

In July 2021, the City recalled the plate and directed Odquina to surrender it.

The City did so first via a July 6, 2021 letter and then by telephone on August 7,

2021.  Complaint ¶¶ 17, 18.  When neither communication had the desired result,

DCS Licensing Administrator Francis Kau sent an August 11, 2021 letter to

Odquina:

> This is a follow-up letter to confirm that the personalized special
> license plate (FCKBLM) has been recalled by the City and County of
> Honolulu.  Thomas Farr, Supervising MVR Clerk I, left you a phone
> message on August 7, 2021 regarding the special plates, requesting
> that you return his call.  He subsequently sent you a letter on Tuesday,
> August 10, 2021.  *Your personalized special license plate has been
> determined to be publicly objectionable due to an implied expletive in
> the first three combination of letters on the license plate.*
>
> Please surrender this plate within six (6) business days from the date
> of this letter, no later than August 19, 2021.  You can turn it in to any
> satellite city hall in the City and County of Honolulu.  We will replace
> your recalled special license plate without additional charge.  If you
> do not want another personalized special license plate, we will refund
> you the $25.00 fee that you paid for the original special plate.
>
> If you fail to return the recalled personalized special license plate by
> August 19, 2021, you will be driving your vehicle with a recalled,
> unauthorized license plate which is considered illegal and equivalent
> to a civil violation under Hawaii Revised Statutes (HRS) Chapter 249.
> Your vehicle may be subject to citation, penalty and possible seizure

---

[4]Niau states that she "had interacted with Mr. Odquina twice before."  Niau Decl. ¶ 7.  She
claims, "The first time, he didn't have his paperwork in order for what he was trying to do, and
we had to turn him away. He was argumentative and aggressive when he didn't get what he
wanted. The second time, and the time he came in for his license plate, he got what he wanted
and he was okay."  *Id.*

11

by the Honolulu Police Department, to which you may redeem within a ten-day period by payment of any delinquent penalties, the cost of storage, and other charges incident to the seizure of the vehicle.

Furthermore, you will not be able to register your vehicle again in the City and County of Honolulu until the recalled license plate is properly surrendered to the Motor Vehicle Registration Branch.  Your cooperation and compliance in this matter would be appreciated.

Dkt. No. 1-2 (emphasis added).  A copy of this letter was also sent to then-interim Honolulu Police Chief Rade Vanic.  *Id.*

Despite receiving these notices, Odquina refused to surrender the plate.  As a result, he was unable to renew his vehicle registration in mid-2021, rendering him unable to lawfully drive his vehicle on a public road.  Complaint ¶ 21.

On June 30, 2022, Odquina received a letter from the County Corporation Counsel, informing him that the County had been "authorized to take legal action against [him] for [his] failure to surrender the special number plates."  *Id.* ¶ 20.

## RELEVANT PROCEDURAL HISTORY

On September 9, 2022, Odquina filed a Complaint against the City and the Attorney General of the State of Hawai'i (collectively, "Defendants"), along with the instant MPI, claiming that HRS § 249-9.1's bar against "publicly objectionable" vanity plates was unconstitutional, both (1) as-applied, and (2) facially.  On September 30, 2022, Defendants opposed the MPI.  City Opp., Dkt. No. 16; State Opp., Dkt. No. 17.  On October 3, 2022, Defendants answered, and the City filed a counterclaim for replevin, claiming entitlement to immediate

12

possession of two FCKBLM license plates and requesting a writ of replevin and mandatory injunction for the plates' return.  Dkt. Nos. 18–19, 18-1 at ¶¶ 14, A–B.  On October 11, 2022, Odquina replied to Defendants' opposition briefs.  City Reply, Dkt. No. 21; State Reply, Dkt. No. 22.  The Court elected to decide this matter without a hearing pursuant to Local Rule 7.1(c) and took the matter under advisement.  *See* Dkt. No. 23.  This Order follows.

## ADDITIONAL FACTUAL HISTORY REGARDING ODQUINA'S BUSINESSES

On August 13, 2021, two days after receiving the August 11, 2021 recall letter and at least a year after telling Farr that his vanity plate was "an acronym for his business," Odquina opened a business called Film Consulting KravMAGA Bloomberg, LLC using the letters "FCKBLM."  Complaint ¶ 16.  On September 22, 2021, he created a separate non-profit corporation called Fight Communism and Knucklehead Bitch Liberal Marxists.[5]  Odquina also operates the website, www.fckblm.org.  *Id.*[6]  In his Complaint, Odquina alleges that he

---

[5]HAWAII.GOV, BUS. REGISTRATION DIV., DEP'T OF COM. & CONSUMER AFFS., *Fight Communism and Knucklehead Bitch Liberal Marxists*, https://hbe.ehawaii.gov/documents/business.html?fileNumber=320498D2 (last visited October 20, 2022) (business not in good standing).

[6]The website, www.fckblm.org (last visited Oct. 20, 2022), contains pictures of a person presumed to be Odquina wearing a "Trump" jersey and Civil War-era military-style clothing, a photo of a person holding a large, serrated Bowie knife, and the following textual content:

> 100% Flag & Anthem Saluting AMERICAN PATRIOTS, ....with DUTY to FIGHT this spread of Socialism and Communism currently promoted by these imbeciles of those our forefathers BEAT 157 years ago.....

"intended to use" the initialism "FCKBLM" on his license plate to "advertise [these] business[es]," with such intent to advertise being "tied to grabbing a viewer's attention and a person being inquisitive about its meaning when seeing the plate." *Id.* ¶¶ 16, 30.

---

Our mission is FOCUSED on RESUSCITATING PATRIOTISM BACK into our Schools, Film Production, Minor to Professional Sports, the Judicial system, both our National and LOCAL Security.

WE THE PEOPLE are not the type content in merely sitting on our asses, spouting off amongst friends  in periodic whispers, about the FACT people are STUPID for continuously voting corrupt LEFTIST POLITICIANS into office..., (e.g. IGE), while simultaneously complaining about the surge of Homelessness and Crime across the land. NO!  Criminals being publicized as social justice Heroes.....

Police being targeted by batshit crazy "Prosecutors" for doing their jobs!? We're fucking DONE being content to complain amongst ourselves about how completely BACKWARDS our quote unquote "WOKE" society has become. [smh]  Apparently our people have been allowed to FORGET..., (influenced by Marxist "Teachers" & "Professors" who belong to communist unions), what happened just 160 years ago, when Democrats pushed our REAL AMERICANS this far.

..It is TIME TO FIGHT.

WE THE PEOPLE....are furiously focused on ELIMINATING the anti-Military anti-Law Enforcement anti-Christian anti-Jewish anti-Flag anti-Anthem...Anti-Constitution... and ANTI-AMERICAN delusional Leftist LIBTARD SCOURGE across nation.

IT'S TIME WE PATRIOTS DO OUR INDIVIDUAL BESTS...TO SAVE OUR COUNTRY.

EVERY AMERICAN FLAG-SALUTING WOMAN & MAN, FROM THE PACIFIC TO THE TIP OF NEW ENGLAND...MUST PREPARE FOR THE INEVITABLE BATTLE AHEAD.

Too many have for the outcome of............... APRIL 9th,1865.

Current Honolulu Police Chief Arthur J. Logan asserts that Odquina informed him, on or around August 14, 2021, that he (Odquina) had lied to Farr about the letters "FCKBLM" being connected with a business.  Declaration of Arthur J. Logan ("Logan Decl.") ¶¶ 3–6, Dkt. No. 16-5.  Logan, then-Investigator with the Department of the Attorney General, was patrolling the Hawaiʻi State Capitol during protests regarding COVID-19-related mask mandates when he noticed Odquina's car with the inappropriate vanity plate.  *Id.* ¶ 3.  "[C]urious as to how someone was able to get the letters 'FCK' on a license plate, since [he] thought profanities were prohibited," Logan approached the vehicle and asked Odquina about the plate.  *Id.* ¶ 5.  Logan claims, "Mr. Odquina told me that he lied about the meaning of the plate when he talked to the license plate office.  He said he made up some story about FCKBLM standing for the name of his business, but that he knew what it really meant."  *Id.* ¶ 6.

## DISCUSSION

I.   **Odquina is not likely to succeed on the merits of his "as-applied" free speech claim.**

The Free Speech Clause of the First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech."[7]  This Clause does not apply to government speech.  *Pleasant Grove City,*

---

[7]The First Amendment is applicable to the States via the Fourteenth Amendment.  *See Gitlow v. New York*, 268 U.S. 652, 664 (1925).

*Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").  By contrast, the Clause applies to private speech that occurs on government property—nonpublic forum speech. Governmental restrictions on nonpublic forum speech must be both reasonable and viewpoint-neutral.  *Walker*, 576 U.S. at 215.

Defendants maintain that vanity plates reflect government speech, *see* City Opp. at 5–6; State Opp. at 11 n.8, while Odquina contends that they contain nonpublic forum speech.  *See* City Reply at 7–8.  The Court agrees with Defendants, such that no First Amendment review is necessary or appropriate. Nonetheless, even if vanity plates contained nonpublic forum speech, the governmental restrictions here would still pass constitutional muster because they are reasonable and viewpoint-neutral.

A.    <u>License plate alphanumerics represent government speech that is not subject to First Amendment review</u>.

*Walker* is instructive.  *Walker* concerned a Texas statute that allowed non-profit entities to submit license plate designs for approval and adoption by the Texas Department of Motor Vehicles Board.  576 U.S. at 204–05.  Once approved and adopted, the designs would become available to the public for purchase.  *Id.*

16

At the time the *Walker* litigation arose, the Board had approved and adopted approximately 350 license plate designs, including graphics and/or slogans, containing messages such as "Jesuit Dallas," "Alpha Phi Alpha," "Knights of Columbus," "Get it Sold with Re/Max," "Dr. Pepper: Always One of a Kind," "Read to Succeed," "I'd Rather Be Golfing," "NASCAR," "Girl Scouts: Where Girls Grow Strong," "Don't Tread on Me," and "Choose Life." *Id.* at 236 (Alito, J., dissenting) (Appendix). The action arose when a non-profit entity known as the Sons of Confederate Veterans ("SCV") proposed a plate design that incorporated a Confederate flag. After a public hearing, the Board unanimously rejected the design because "public comments had shown that many members of the general public f[oun]d the design offensive," and "such comments [we]re reasonable." *Id.* at 207.

SCV sued the Board, asserting a violation of its freedom of speech and seeking an affirmative injunction that would require the Board to approve the design. The District Court for the Western District of Texas entered judgment for the Board, and a divided panel of the Court of Appeals for the Fifth Circuit reversed, holding that the designs were private speech and that the Board's refusal to approve the design constituted unconstitutional viewpoint discrimination.

The Supreme Court reversed, holding that specialty license plate designs were government speech, based on three factors: (i) the history of expressive

messages on license plates, (ii) the state's perceived endorsement of any such messages, and (iii) the extent to which the state exerted control over such messaging.  *Id.* at 208–09.

With regard to the first factor, the Court assessed whether license plate graphics and slogans had historically conveyed messages from the government or from private individuals.  *Id.* at 210–11.  Noting that such messaging was a relatively new phenomenon, first arising in the United States in the 1910s and 1920s, the Court reviewed early license plate designs[8] and found that states, including Texas, had long used license plate slogans to communicate government messages, including "to urge action, to promote tourism, and to tout local industries."  *Id.* at 211.  Ultimately, the Court concluded, "[T]he history of license plates shows that, insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States."  *Id.* at 210–11.

With regard to the second factor, *Walker* concluded that reasonable observers would "closely identif[y]" the State of Texas with specialty license plate designs and would believe that Texas had endorsed or approved of the messaging.

---

[8]Examples included a steer's head (Arizona), a codfish (Massachusetts), a rider atop a bucking bronco (Wyoming), a brown potato accompanied by the slogan "Idaho potatoes" (Idaho), and the phrases "North to the Future" (Alaska), "Keep Florida Green" (Florida), "Hoosier Hospitality" (Indiana), "The Iodine Products State" (South Carolina), "Green Mountains" (Vermont), and "America's Dairyland" (Wisconsin).  *Walker*, 576 U.S. at 211.

*Id.* at 212.  The Court reasoned that "[t]he governmental nature of the plates [wa]s clear from their faces": each plate bore the name "TEXAS" at the top, and Texas issued the plates, regulated their disposal, and owned the designs.  *Id.*  As the Court put it, license plates "[we]re, essentially, government IDs"—"government article[s] serving the governmental purposes of vehicle registration and identification."  *Id.* Moreover, not only was it reasonable for observers to assume the state had endorsed the designs' messages, but the Court further reasoned that those submitting and purchasing these designs likely *intended* to convey that the State endorsed the message:

> If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate.  But the individual prefers a license plate design to the purely private speech expressed through bumper stickers.  That may well be because Texas's license plate designs convey government agreement with the message displayed.

*Id.* at 212–13.

Third and finally, *Walker* considered the large extent to which Texas "maintain[ed] direct control over the messages conveyed on its specialty plates." *Id.* at 213.  The statutory scheme provided that the State "ha[d] sole control over the design, typeface, color, and alphanumeric pattern for all license plates," and the Board "actively exercised" its authority to "approve every specialty plate design proposal."  *Id.* (citing Tex. Transp. Code Ann. § 504.005).

In light of the three factors, *Walker* held that the specialty designs were government speech. The Court went on to explicitly contrast the specialty designs from examples of nonpublic forum speech. For instance, the designs did not resemble private organizations' private messages sent through a school district's internal mail system. *Id.* at 218 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983)). Nor were they like private advertisements on a city bus, which "bore no indicia that the speech was owned or conveyed by the government." *Id.* (citing *Lehman v. Shaker Heights*, 418 U.S. 298 (1974)). The Court explained that "[t]he fact that private parties t[ook] part in the design and propagation of [the design] message[s] d[id] not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Id.* at 217.

Like *Walker*'s designs, vanity plates similarly represent government speech. *Walker'*s three-part test is as substantively relevant to personalized alphanumerics as it was to plate design. *Id.* at 204.

<u>History</u>

Alphanumerics on Hawaiʻi's license plates serve the "governmental purposes of vehicle registration and identification," principally to enable members of the public, law enforcement, and administrative officers to identify vehicles. *Id.* at 212. HRS § 249-9, *et seq.*, local administrative Rules, and directed web

20

guidance reinforce these purposes.  *See, e.g.*, Dkt. No. 1-3 (stating the purpose of license plate alphanumerics is "for law enforcement officers to identify vehicles in cases of crime and to safeguard drivers on the road"); Rule 6.8(3)(c) (providing that the restrictions on personalization are intended to "[p]rotect license plates, which are necessary to the lawful regulation and identification of vehicles, from vandalism and defacement that impair their function"); HRS § 249-9.3 (requiring license plate alphanumerics to be "readily identifiable and distinguishable under actual traffic conditions"); *ibid.* (prohibiting personalized decals from "obstruct[ing] the visibility of the number or letters or any other information that is required by law to be on the license plate").  Despite any personalization the State may allow, all Hawaiʻi license plates must conform to a uniform style, conducive to these purposes.

To the extent that the content of license plates serves these purposes *and* communicates some *other* message, state and local governments have historically used the license plate forum to convey their own speech.  *See Walker*, 576 U.S. at 210–11 ("[T]he history of license plates shows that, insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States.").  As *Walker* explained, "license plates are, essentially, government IDs.  And issuers of ID typically do not permit the placement on their IDs of messages with which they do not wish to be

associated." *Id.* at 210 (quotation marks and citation omitted).  In fact, Honolulu has specifically advised that "[a]ll license plates issued in the City and County of Honolulu are government property *and speak for the Hawai'i state government*." Dkt. No. 1-3 (emphasis added).  As with *Walker*'s slogans and graphics, even if private parties participate in crafting the message, its "governmental nature" is not extinguished.  *See Walker*, 576 U.S. at 217.

Endorsement

Just as *Walker*'s license plate designs were "closely identif[ied]" with Texas, *see id.* at 212, so too here, license plate alphanumerics are closely identified with Hawai'i.  Although the general populace most certainly understands that vanity license plates are attributable in some respect to the vehicle owner, reasonable observers are also aware that vanity plates must be approved and printed by the government, and that they are used as official identification and registration numbers for the vehicle.  Here, as in *Walker*, "[t]he governmental nature of the plates is clear from their faces."  *Id.*  License plate alphanumerics appear smack-dab in the middle of license plates with the word "Hawaii" mandatorily appearing along the upper portion of the plate and the phrase "Aloha State" below.

The reality that state and city governments are closely associated with official messaging on license plates is also demonstrated by the substantial restrictions the City has imposed on the messages.  *See* Rule 6.8 (imposing

restrictions for the purpose of "[p]revent[ing] governmental involvement" with

prohibited messaging). Furthermore, as discussed above, the City *explicitly*

endorses the messages conveyed on license plates. *See* Dkt. No. 1-3 ("All license

plates issued in the City and County of Honolulu are government property and

speak for the Hawai'i state government."). The City also publicly outlines its

significant review process and states that it reserves "the right to regulate what can

be written on a license plate." *Id.* In light of these facts, a reasonable observer

would rightly believe that the government had endorsed or approved of any

message on a Hawai'i vanity plate.

Moreover, as in *Walker*, it is likely that vehicle owners *intend* for the

government to be associated with their chosen message. *See Walker*, 576 U.S at

212 ("[A] person who displays a message on a [] license plate likely intends to

convey to the public that the State has endorsed that message."). Otherwise, the

individual could simply choose to place a decal in their window, a magnetic

placard on their vehicle door, or a sticker on the bumper. *See id.* Instead, here,

Odquina has chosen to enlist the *government* to print and issue an official license

plate with his message and to use that message as the official identification and

registration number for his vehicle.  The association is not accidental, and it has the intended effect.[9]

Control

Finally, just as in *Walker*, Hawai'i "maintains direct control over the messages conveyed" on its vanity plates.  *See Walker*, 576 U.S. at 213.  Hawai'i's statutory scheme provides that all plates must conform to a uniform style: the alphanumeric must be of the same color, contrast, and size, and only six characters and one hyphen are allowed with no other punctuation.  HRS § 249-9 *et seq*. Regarding content, the State instructs that the combination may not be "misleading or publicly objectionable," and directs the localities to "adopt rules . . . to carry out" this guidance.  And the City does so with the imposition of extensive restrictions on the types of messages allowed, including detailed definitions and explanations of how to apply the Rules:

Rule 6.8 Standards for Denial of Special Number Plates:

1. The following applications shall be denied:

a. Applications with the letter/numeral combination of regular plates.

---

[9] *See, e.g.*, MPI at 5 n.2 (collecting news articles in which members of the public express concern with their government's endorsement of the message "FCKBLM"); KITV, *Offensive Honolulu License Plate Still on the Road One Year Later*, June 3, 2022, https://www.kitv.com/news/local/offensive-honolulu-license-plate-still-on-the-road-one-year-later/article_1801eb30-e312-11ec-97f2-0f0f1697cc7d.html (last visited Oct. 26, 2022) (member of the public stating, "If you claim to be the Aloha State, then do something about it.").

b. Applications with the letter/numeral combinations which have been already assigned . . . .

c. Applications bearing the following types of words or connotations:

(1) Words or connotations of a sexual or vulgar nature, or relating to excretory functions or intimate body parts;

(2) Drug-related words or connotations;

(3) Words or connotations which are ethnic in origin or character and which are judged by the Director to be offensive and disparaging.

2. For purposes of this rule, the following standards shall apply:

a. In determining the connotation, inference, or tendency of a given request, the Director shall apply an objective test of what inference may reasonably be detected by one conversant with whatever linguistic, numerical, or phonetic mode of communication that may apply to the request. The Director may not consider the subjective intent or the declared meaning of the applicant. The request shall be considered to be the most objectionable connotation that reasonably may be ascribed to it.

b. "Words of a vulgar nature" shall be those words, the connotation of which is "vulgar," "usually considered vulgar," "not used in polite conversation," or equivalently designated in Webster's Collegiate Dictionary, current edition.

c. "Intimate body parts" shall include breasts, genitalia, pubic area, buttocks, thighs, and organs related to sexual and eliminatory functions, regardless of whether the request is couched in common, foreign, vulgar, scientific, or other message form.

d. "Drug-related words or connotations" shall mean messages that may objectively be construed as referring to any drug, narcotic, or intoxicant, including alcohol, that may be abused so

25

as to produce a physical or mental condition that is inconsistent with the lawful, safe operation of a motor vehicle by the person affected. . . .

e. "Words or connotations which are ethnic in origin or character" shall mean messages which may reasonably be the basis of age, sex, race, nationality, or creed.

f. "Offensive or disparaging" shall mean any message which may reasonably be construed as singling out any definable class of persons, classified on the basis of age, sex, race, nationality, or creed in a manner that subjects that class to contempt or ridicule, or espouses superiority of that class.

Rule 6.8; *see also* Dkt. No. 1-3 ("Forbidden phrases include terms of lust, depravity, prejudice, hostility, contempt and profanity in English or any other language."). The City also requires applicants to explain the meaning of their messages and imposes a process for evaluating, flagging, and re-evaluating any applications. Moreover, the City provides a list of policy reasons for exercising such strict control over the messaging. *See* Rule 6.8(3).

In sum, considering the history of government communication through license plates, the reasonable perception of government association with and endorsement of vanity plate messaging, and the level of government control over such messaging, Hawaiʻi's vanity plate alphanumerics are government speech within the meaning of *Walker*. *Cf. Comm'r of Ind. Bur. of Motor Vehicles v. Vawter*, 45 N.E. 3d 1200 (Ind. 2015). As the Free Speech Clause does not restrict

26

the government's regulation of its own speech, the Clause does not apply to vanity plates, and Odquina's First Amendment challenge has no merit.

The Court acknowledges that its holding in this respect diverges from some courts, which have distinguished vanity plates from *Walker*'s specialty designs and determined that vanity plates are not government speech. *See, e.g.*, *Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 927 (N.D. Cal. 2020); *Carroll v. Craddock*, 494 F. Supp. 3d 158 (D.R.I. 2020); *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E. D. Ky. 2019); *Mitchell v. Md. Motor Vehicle Admin.*, 126 A.3d 165 (Md. Ct. App. 2015), *aff'd by* 148 A.3d 319 (Md. 2016).[10]  The divergence may be explained, in some instances, by subtle differences between these cases' relevant statutory schemes, and the facts at issue here.[11]  In other instances, the Court simply disagrees with the reasoning in these non-binding cases.  For example, the Maryland Court of Special Appeals concluded that vanity plates were fundamentally different from plate designs, in part because the designs were "custom designed, official-looking alternate base plates," while vanity plates were

---

[10]Some pre-*Walker* cases discussed vanity plates as nonpublic forum speech without addressing whether the plates were government speech. *See, e.g.*, *Perry v. McDonald*, 280 F.3d 159, 168–69 (2d. Cir. 2001); *Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 823 (W.D. Mich. 2014).

[11]For example, in *Mitchell*, the relevant State regulation gave the Motor Vehicle Administration ("MVA") "discretion" to deny vanity plates containing profanity, and it allowed, but did not require, the City to adopt rules for carrying out its guidance.  126 A.3d at 169, 181–82.  Thus, the MVA did not "exert[] such tight control" as in *Walker* and here.  *Id.* at 186.  Additionally, unlike in Hawai'i, Maryland's State plates never displayed State slogans.  *Id.* at 183.  And, Maryland formally differentiated its base plate for vanity plates from its standard base plate by removing the State of Maryland's website, www.maryland.gov, from the bottom of the former.  *Id.*

"not official-looking." *Mitchell*, 126 A.3d at 185–86. Vanity plates require the printing of up to six letters or numbers in the same style as non-personalized alphanumerics, on a hard license plate, to be issued by the government and affixed by law to a vehicle for official identification and registration purposes. Like *Walker*'s custom designs, vanity plates sometimes contain whimsical or idiosyncratic messages that have been formally approved. They are just as "official-looking" as any other license plate.

As another example, regarding endorsement, some of these cases opined that "[o]bservers of vanity plates understand reasonably that the messages come from vehicle owners," not the government. *See, e.g.*, *Mitchell*, 148 A.3d 319, 328; *Hart*, 422 F. Supp. 3d at 1232 ("While plate *designs* are attributed by the populace to the state, vanity plates are not. The Kentucky personalization program . . . is concerned instead with the individual applicant's message."). The Court agrees that vanity plates are "readily associated with [a vehicle's] operator" and even "implicate the free speech rights of [those] private persons." *See Walker*, 576 U.S. at 219. However, this in no way precludes the conclusion that the plates consist of government speech. *See id.* (acknowledging that drivers *also* convey the government speech messages communicated through their license plate designs and stating that, "just as Texas cannot require SCV to convey the State's

28

ideological message, SCV cannot force Texas to include a Confederate battle flag on its specialty license plates").[12]

B. <u>Even if vanity plates reflect nonpublic forum speech, subjecting the governmental restrictions here to First Amendment scrutiny, these restrictions are constitutional because they are both reasonable and viewpoint-neutral.</u>

Restrictions on nonpublic forum speech must be both "reasonable in light of the purpose of the forum and…viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *see also Summum*, 555 U.S. at 469–70.[13]  To be considered reasonable, a restriction must "further[] a legitimate government interest" in light of the "nature of the relevant forum." *Cornelius*, 473 U.S. at 800, 808.  "[C]ommon-sense . . . is sufficient . . . to uphold a regulation under reasonableness review." *United States v. Kokinda*, 497 U.S. 720, 734–35 (1990) (O'Connor, J., plurality opinion).

---

[12]Some of these cases also rely on what appears to be dicta in *Matal v. Tam*, 137 S. Ct. 1744, 1758, 1760 (2017)—that "*Walker* provides the outer bounds of government speech" and that courts "must exercise great caution before extending . . . government speech precedents." *See, e.g., Carroll*, 494 F. Supp. 3d at 166; *Hart*, 422 F. Supp. 3d at 1233.  That is no reason, however, not to carefully employ the *Walker* rubric beyond plate designs, particularly to issues as closely related as plate alphanumerics.

[13]At various times in his Complaint and MPI, Odquina—without citing any authority—misstates the applicable legal standard of review as "strict scrutiny."  *See, e.g.*, Complaint ¶¶ 29, 31.  Strict scrutiny applies to restrictions on private speech in a *public* forum.  *See Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001).  The less stringent standard articulated here applies to private speech occurring in a *nonpublic* forum, *see Cornelius*, 473 U.S. at 811 ("[N]onpublic for[a] by definition [are those] not dedicated to general debate or the free exchange of ideas.");  this standard has been exclusively applied to vanity plate messaging by every federal court to have considered the issue.  *See, e.g., Ogilvie*, 540 F. Supp. 3d at 927; *Carroll*, 494 F. Supp. 3d at 158; *Hart*, 422 F. Supp. 3d at 1233.

With regard to viewpoint-neutrality, the government may impose *content-based* restrictions, but once a particular topic or subject matter has been allowed, the Government may not then regulate speech on that topic or subject matter in a manner that favors some viewpoints or ideas at the expense of others. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *Tam*, 137 S. Ct. 1744, 1750 (2017) ("The test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed."); *see Hart*, 422 F. Supp. 3d at 1234 (providing as an example of viewpoint-discrimination a transportation authority that allowed the license plate "IM4GOD" while rejecting "IMGOD").[14]  Viewpoint neutrality also requires some limitation on the licensing authority's discretion as it applies the rules in any given situation. *Kaahumanu v. Hawaiʻi*, 682 F.3d 789, 806–07 (9th Cir. 2012).  However, "flexible" standards that allow for "considerable discretion" may still be viewpoint-neutral because "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

---

[14]*See also* Farr Decl. ¶ 12 ("I have a very clear understanding that we cannot discriminate based on viewpoint. Many years ago—in the mid to late 1990s—I had initially rejected a plate that referred to Satan. My supervisor at the time informed me that we had to allow the plate because we allowed other plates that had religious messages. I have remembered that lesson very clearly.").

i.    Odquina's argument that the City recalled his plate due to its negative reference to "Black Lives Matter" has no merit.

Odquina contends that the City impermissibly discriminated against him on the basis of his viewpoint by recalling his license plate due to its anti-BLM message and without the benefit of any guidelines.  *See* Complaint ¶ 43 (asserting that the City viewed his "strong personal views and disapprov[al] of the BLM movement" as "publicly objectionable," which "brought County council to target [him]"); MPI at 5 n.2 (collecting news reports expressing public distaste with the plate); *ibid.* at 6–7 ("County's decision to recall the plate was due to [Odquina's] strong message and not according to any guidelines as there are none."); *ibid.* at 2 ("The HRS does not define 'misleading or publicly objectionable.'"); *ibid.* ("Neither the HRS nor the Department of Budget and Fiscal Services provide[s] any guidance regarding the review or approval of personalized specialty license plates ordered pursuant to HRS [§] 249-9.1.").

Odquina's claim is specious for at least two reasons.  First, the evidence presented to date, by both sides, indicates that the City recalled the plate because of the letters "FCK"—not because of its reference to  "BLM."  *See* Farr Decl. ¶¶ 7, 9 (stating the plate was flagged because "FCK [wa]s an abbreviated swear word," and "[s]wear words have always been prohibited on personalized license plates"); *ibid.* ¶ 15 (explaining that Farr should have rejected the plate based on the first three letters and not its negative reference to BLM); Niau Decl. ¶¶ 1, 3 (stating that

Niau flagged the plate because "it violated [DCS] policy against allowing profanity on license plates"); Dkt. No. 1-2 (informing Odquina, "Your personalized special license plate has been determined to be publicly objectionable due to an implied expletive in the first three combination of letters on the license plate.").

Second, the notion that there is no guidance or standards by which to measure vanity plate messaging, other than HRS § 249-9.1's prohibition on "misleading or publicly objectionable" letter combinations, is simply wrong.   The City's 1990 and 1994 Rules, for example, provide substantial objective guidance of the sort that Odquina claims is missing. *See supra* at 5–8.

Perhaps these are the reasons why, after, among other things, Defendants' opposition briefs proffered the local administrative Rules, Odquina's replies remained silent about the supposed absence of standards or the alleged Black Lives Matter motivation behind the City's recall decision.  Odquina appears, in other words, to have abandoned both assertions.

    ii.    <u>Odquina's argument challenging the City's ban on his implied expletive is similarly meritless.</u>

What Odquina has not abandoned is his contention that the City's ban on profanity is itself viewpoint-discriminatory. *See* Reply Brief in Response to City Opp. ("City Reply") at 4, Dkt. No. 21 ("We . . . know that explicit and clear swearwords and vulgarity are viewpoint protected speech."); *ibid.* at 9 ("Viewpoint discrimination includes giving offense . . . no matter how significant or strong the

message, or, to some, the offensiveness of the strong message, including profanity or vulgarity."); Reply Brief in Response to State Opp. ("State Reply") at 4, 9, Dkt. No. 22 (similar).  Odquina also contends that the Rules provide too much discretion to deciding officials.  *See, e.g.*, Complaint ¶ 44 ("HRS 249-9.1 allows State and County to silence free speech for any reason including that [they] do not agree with the message.").  As described more fully below, these arguments are unavailing.  The City's rule against profanity on vanity plates is both reasonable and viewpoint-neutral.

Reasonableness[15]

The prohibition against "words . . . of a . . . vulgar nature," *see* Rule 6.8(1)(c), is reasonable because it furthers a legitimate government interest in light of the nature of the forum.  *See Cornelius*, 473 U.S. at 808.  The Rules explicitly outline two such interests:

Rule 6.8(3). The policies underlying this rule are to:

> . . .

> b. Protect the public and children, who by necessity must use the public highways and therefore be exposed to license plate messages, from offensive, obscene, or unduly distractive messages that may tend to impair their safety or privacy;

---

[15]It is not apparent that Odquina argues that the Rules against profanity are unreasonable, but the Court will nevertheless briefly address it.

c. Protect license plates, which are necessary to the lawful regulation and identification of vehicles, from vandalism and defacement that impair their function. . . .

Indeed, a rule restricting license plate profanity furthers both of these legitimate government interests.  It protects members of the public and children from viewing "offensive" or "obscene" messages when they "by necessity must use the public highways."  *See id.*  And since profane messages are susceptible to vandalism, it helps to prevent defacement, which would impair the principal function of license plates—the identification of vehicles.  Applying such "common-sense" rules, *see Kokinda*, 497 U.S. at 734–35, countless states and federal organizations have similar reasonable rules prohibiting profanity in nonpublic fora.[16]

---

[16]*See, e.g.*, Declaration of Daniel M. Gluck ("Gluck Decl."), Dkt. No. 16-7 (describing the following state prohibitions regarding personalized license plate content): Exh. A (Alaska: "vulgar, violent, or criminal reference[s]"); Exh. B (Delaware: "obscenity, vulgarity, profanity, hate speech, or fighting words"); Exh. C (Georgia: language that is "obscene according to current community standards, or which includes any reference to sex, sexual acts or body parts, or any reference to excrement or to bodily fluids"); Exh. D (Michigan: language that is "hate speech, profanity, sexually explicit, or excretory"); Exh. E (Nebraska: "objectionable, obscene or offensive words or phrases"); Exh. F (New Hampshire: language that involves "[i]ntimate body parts or genitals; [s]exual or excretory acts or functions; [w]ords or terms of profanity or obscenity"); Exh. H (New York: language that is "obscene, derogatory or offensive"); Exh. J (Pennsylvania: language that is "[p]rofane, lewd, lascivious, obscene, or vulgar; . . . sexual innuendo or sexual connotations; . . . excretory functions); Exh. K (Utah: "vulgar, derogatory, profane, or obscene" language); Exh. L (Vermont: "vulgar, scantological, or obscene" language); Exh. M (Washington: "[v]ulgar, racial, ethnic, or indecent messages"); Exh. N (Wyoming: "obscene, vulgar, indecent, or pruriently suggestive" language); *see also* FEDERAL COMMUNICATIONS COMMISSION, *Obscene, Indecent and Profane Broadcasts* (Dec. 30, 2019) ("Federal law prohibits obscene, indecent and profane content from being broadcast on the radio or TV…. Indecent and profane content are prohibited on broadcast TV and radio between 6 a.m. and 10 p.m., when there is a reasonable risk that children may be in the audience."), https://www.fcc.gov/consumers/guides/obscene-indecent-and-profane-broadcasts (last visited Oct. 27, 2022); HRS § 481P-3 ("It is an abusive telemarketing act or practice and a violation of this chapter for any seller or telephone solicitor to . . . [t]hreaten, intimidate, or use profane or

34

<u>Viewpoint-Neutrality</u>

The Rules against profanity are also viewpoint-neutral.  First, contrary to Odquina's contention, the Rules do not give "unbridled discretion" to DCS officials to approve or reject vanity plate applications based on their own personal preferences.  *See Kaahumanu*, 682 F.3d at 806.  On the contrary, they provide guidance—in relatively minute detail—explaining how the rule against "vulgar words" should be applied, right down to which dictionary should be used:

> Rule 6.8(2). For purposes of this rule, the following standards shall apply:
>
>> a. In determining the connotation, inference, or tendency of a given request, the Director shall apply an objective test of what inference may reasonably be detected by one conversant with whatever linguistic, numerical, or phonetic mode of communication that may apply to the request.  The Director may not consider the subjective intent or the declared meaning of the applicant.  The request shall be considered to be the most objectionable connotation that reasonably may be ascribed to it.
>>
>> b. "Words of a vulgar nature" shall be those words, the connotation of which is "vulgar," "usually considered vulgar," "not used in polite conversation," or equivalently designated in Webster's Collegiate Dictionary, current edition.

As important, the Rules were not haphazardly applied here.  By any objective standard, the word "f-c-k" is vulgar or profane.  *See* Webster's Collegiate Dictionary (1979 ed.) at 459 ("usu. considered obscene"); Webster's New World

---

obscene language[.]"); Me. Rev. Stat. § 453 (prohibiting license plates that include language that is "profane or obscene" or "[c]onnotes genitalia or relates to sexual acts").

College Dictionary (5th ed. 2014) at 584 ("Vulgar"); Merriam-Webster Collegiate Dictionary 505 (11th ed. 2017) ("usually obscene" or "usually vulgar").

Second, while the viewpoint-neutrality requirement protects one's right to express one's "strong" and "offensive" views on a permitted topic in a nonpublic forum, *see* City Reply at 9, it does not protect a right to express those views in whatever *manner* one chooses, including, for instance, with profane language. In other words, a rule against profanity does not limit the right to express one's views, but only limits the mode of that expression. Other cases have held the same. *See, e.g.*, *Perry v. McDonald,* 280 F.3d 159, 170–171 (9th Cir. 2001) (holding that a rejection of a vanity plate with the letters "SHTHPNS," standing for "sh-t happens," was viewpoint-neutral); *Mitchell*, 126 A.3d at 195 (holding that a recall of a vanity plate with the letters "MIERDA," Spanish for "sh-t," was viewpoint-neutral), *aff'd by* 148 A.3d at 337.

Odquina claims that four more recent cases directly support his stance to the contrary: two from the U.S. Supreme Court, *Tam*, 137 S. Ct. at 1744, and *Brunetti*, 139 S. Ct. at 2294; and two federal district court cases, *Ogilvie v. Gordon*, 540 F. Supp. 3d 920 (N.D. Cal. 2020) and *Carroll v. Craddock*, 494 F. Supp. 3d 158 (D. R.I. 2020). As discussed below, Odquina badly misconstrues the first three of these four cases. The fourth case, while indeed supporting his stance, similarly

36

misconstrues the relevant caselaw and does not persuade this Court that a rule against profanity is viewpoint-discriminatory.

First, Odquina claims that "explicit and clear swearwords and vulgarity are viewpoint protected speech" because *Tam* stated, "Giving offense is a viewpoint." *See* City Reply at 4 (citing 137 S. Ct. at 1765). *Tam* held that *disparagement* was a viewpoint and, thus, that a federal statute's prohibition of trademarks that disparaged people was viewpoint-discriminatory. 137 S. Ct. at 1765. *Tam* did *not* articulate a right to offend in whatever *manner* one desires. The Court upheld the right to state an offensive view, idea, perspective, or point of view—not the right to use any particular offensive word. As the Court stated:

> Giving offense is a viewpoint.   We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. . . .   If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. . . .

*Id.* at 1765; *see also ibid.* at 1766 (J. Kennedy, concurring):

> [I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys. . . .   The government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

A particular mode of expression is not a viewpoint. Nothing in the City's Rules as-applied here prevents Odquina from expressing his viewpoint on Black Lives

Matter or any other matter.  And nothing in *Tam* protects Odquina's right to use profanity while expressing that viewpoint.

Odquina also relies on *Brunetti*, 139 S. Ct. at 2294.  There, the Supreme Court held that a federal statute's bar against trademarks comprised of "immoral[] or scandalous matter" was viewpoint-discriminatory because, based on the definitions of the words "immoral" and "scandalous," the statute too broadly allowed rejection of any mark that "g[ave] offense to the conscience or moral feelings," "excited[d] reprobation," "call[ed] out condemnation," or was "inconsistent with rectitude, purity, or good morals," "wicked," "vicious," "shocking to the sense of truth, decency, or propriety," "disgraceful," "offensive," or "disreputable."  *Id.* at 2299–2300.  In so holding, the Court explicitly explained that the terms "immoral" and "scandalous" could *not* be artificially interpreted to mean something narrower like "vulgar[,] . . . lewd, sexually explicit, or profane," or "offensive or shocking to a substantial segment of the public because of their *mode* of expression, independent of any views that they may express."  *Id.* at 2301. The Court did not disagree that if "immoral" and "scandalous" *could* be more narrowly construed in those ways, the bar might be viewpoint-neutral.  *Id.* at 2301–02.  However, the terms were not ambiguous, and the Court refused to adopt the altered, narrower meanings.  *Id.* at 2301.

In other words, *Brunetti* does not support Odquina's position at all.  On the contrary, the case undermines his position by explicitly differentiating the broader prohibition on "immoral" and "scandalous" material from a hypothetical, narrower prohibition on "vulgar[,] . . . lewd, sexually explicit, or profane" "mode[s] of expression," *see id.* at 2300, like the one at issue here.  *See* Rule 6.8 (prohibition on "words . . . of a . . . vulgar nature").  In fact, Justice Alito's concurring opinion in *Brunetti* clarified:

> Our decision does not prevent Congress from adopting a more carefully focused statute that precludes the registration of marks *containing vulgar terms that play no real part in the expression of ideas*.  The particular mark in question in this case could be denied registration under such a statute.  The term suggested by that mark is not needed to express any idea and, in fact, as commonly used today, generally signifies nothing except emotion and a severely limited vocabulary.

*Id.* at 2302–03 (emphasis added).  Chief Justice Roberts' separate opinion went even further:

> I agree with the majority that the "immoral" portion of the provision is not susceptible of a narrowing construction that would eliminate its viewpoint bias.  As Justice SOTOMAYOR explains, however, the "scandalous" portion of the provision is susceptible of such a narrowing construction.  Standing alone, the term "scandalous" need not be understood to reach marks that offend *because of the ideas they convey; it can be read more narrowly to bar only marks that offend because of their mode of expression—marks that are obscene, vulgar, or profane*.  That is how the PTO now understands the term, in light of our decision in *Matal v. Tam*, 137 S. Ct. 1744 (2017).  I agree with Justice SOTOMAYOR that such a narrowing construction is appropriate in this context. . . .

> [R]egardless of how exactly the trademark registration system is best conceived under our precedents—a question we left open in *Tam*— *refusing registration to obscene, vulgar, or profane marks does not offend the First Amendment.* . . .   The Government, meanwhile, has an interest in not associating itself with trademarks whose content is obscene, vulgar, or profane.  *The First Amendment protects the freedom of speech; it does not require the Government to give aid and comfort to those using obscene, vulgar, and profane modes of expression.*

*Id.* at 2303–04 (emphasis added); *ibid.* at 2310 (J. Sotomayor, concurring in part and dissenting in part) (similar).  In short, the commenting Justices agreed that a ban on "vulgar"—the same ban present here—would not have been viewpoint-discriminatory.  *Brunetti* offers Odquina no refuge.

Odquina's reliance on *Ogilvie* is equally ineffective.  540 F. Supp. 3d at 920.  There, the District Court for the Northern District of California held that prohibitions on vanity plates that "carr[ied] connotations offensive to good taste and decency" or were "immoral or scandalous" were viewpoint-discriminatory.  *Ogilvie*'s reasoning was similar to that in *Brunetti*.  The *Ogilvie* transportation board allowed vanity plates connoting "love," but rejected plates connoting "hate."  *See id.* at 928.  The *Ogilvie* court held that this sort of "happy-talk clause" was viewpoint-discriminatory.  However, *Ogilvie* explicitly explained it was *not* holding that "the DMV [could ]not prohibit certain words from appearing on . . . license plates."  *Id.* at 929 (specifically highlighting Chief Justice Roberts' *Brunetti* partial concurrence that "obscenity, vulgarity, profanity, hate speech, and fighting

words fall outside the scope of the First Amendment's protections").  Odquina's reliance on *Ogilvie* is as misplaced as it was on *Brunetti*.

Finally, Odquina accurately relies on *Carroll*, in which the District Court for the District of Rhode Island held that a state's prohibition of an implied "f-k" on a license plate was viewpoint-discriminatory.  494 F. Supp. 3d at 158 (holding that a state could not prohibit the license plate "FKGAS").  The *Carroll* court stated that *Tam* and *Brunetti* "established that [a] government's attempt to prohibit words on the basis of their scurrilous nature amounts to viewpoint discrimination."  *Id.* at 168.  As discussed above, this Court simply disagrees with this misconstruction of *Tam* and *Brunetti*.  Profanity is not a viewpoint.

## II.    Odquina is not likely to succeed on the merits of his facial claim because HRS § 249-9.1 is not vague or overbroad.

Odquina argues in his Complaint, although it is less clear in his MPI, that HRS § 249-9.1 is facially vague and overbroad.  Complaint ¶¶ 35–37, 49–48.  This argument seems to be premised on the same misapprehension discussed above— that no administrative rules exist to expound HRS § 249-9.1's ban on "publicly objectionable" vanity plates.  *See, e.g.*, Complaint ¶ 36 ("[HRS § 249-9.1] imposes a categorical ban on personalized license plates that are 'misleading or publicly objectionable.'").  Odquina's Reply Briefs rightfully appear to abandon this argument, in light of the fact that such detailed local rules do exist.  Nevertheless, since the claim was brought in the Complaint, the Court will briefly address it.

Facial challenges to statutes may be brought on grounds of vagueness or overbreadth.  A person bringing such a challenge has "a heavy burden in advancing their claim."  *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (explaining facial invalidation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort").  Although "[m]any statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties," *Rose v. Locke*, 423 U.S. 48, 49–50 (1975) (per curiam) (quotation marks and citation omitted), a law crosses the line as "unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.'"  *Hum. Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (quotation marks and citation omitted).  A statute is unconstitutionally overbroad "if a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks and citation omitted).

"In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131

(1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *Ward*, 491 U.S. at 795–96 ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.'"); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir. 2006) (similar).

Here, the state legislature specifically directed the City's director of finance to adopt rules to carry out HRS § 249-9.1.  The director of finance did so.  Rule 6.8, then, is properly viewed as the authoritative interpretation of HRS § 249-9.1's prohibition on "publicly objectionable" material, and, consequently, the facial constitutionality of the statute should be viewed in light of that Rule.

Rule 6.8's prohibition on vulgar words is not vague or overbroad.[17]  First, the term "words of a vulgar nature" is not "so indefinite as to allow arbitrary and discriminatory enforcement."  *See Brumsickle*, 624 F.3d at 1019.  Quite the opposite: the City provides clear and detailed guidance on how the term should be construed.  *See* Rule 6.8(2)(a)–(b) ("'Words of a vulgar nature' are those words,

---

[17]In accordance with the severability clause, *see* Rule 6.4, if any portion of the rules is invalid, that may not invalidate any other portion of the rules.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S. Ct. 1476 (1987); *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2349 (2020).

the connotation of which is 'vulgar,' 'usually considered vulgar,' 'not used in polite conversation,' or equivalently designated in Webster's Collegiate Dictionary, current edition."); Dkt. No. 1-3 ("Forbidden phrases include terms of lust, depravity, prejudice, hostility, contempt *and profanity in English* or any other language.") (emphasis added).  Second, at a minimum, any conceivable unconstitutional applications are clearly outweighed when "judged in relation to [the rule's] plainly legitimate sweep."  *See Stevens*, 559 U.S. at 461.

## CONCLUSION

Because Odquina has not demonstrated a likelihood of success on the merits of any of his claims, the Court does not reach the second, third, and fourth elements of a preliminary injunction.  *See Winter*, 555 U.S. at 20 (holding that all four elements are required to obtain a preliminary injunction); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("The first factor under *Winter* is the most important . . . .  Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements.'") (quoting *Ass'n des Eleveurs de Canards et d'Oies du*

*Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).  For the reasons set forth herein, Odquina's Motion for a Preliminary Injunction, Dkt. No. 3, is DENIED.

IT IS SO ORDERED.

DATED: November 4, 2022 at Honolulu, Hawai'i.



_____
Derrick K. Watson
United States District Judge

---

*Edward Odquina v. City and County of Honolulu, et al.*; Civil No. 22-00407
DKW-RT; **ORDER DENYING PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**